**Brooks M. Foster, OSB No. 042873**
E-mail: bfoster@chenowethlaw.com
**Bradley T. Crittenden, OSB No. 173274**
E-mail: bcrittenden@chenowethlaw.com
Chenoweth Law Group, PC
510 SW Fifth Avenue, Fifth Floor
Portland, OR  97204
Telephone:  (503) 221-7958
Facsimile:  (503) 221-2182

*Attorneys for Plaintiff St Helens Assets, LLC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| ST HELENS ASSETS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ST. HELENS,<br><br>Defendant. | Case No.<br><br>**COMPLAINT**<br><br>(Claims for Cost Recovery Under CERCLA and Remedial Action Costs Under Or. Rev. Stat. 465) |

Plaintiff St Helens Assets, LLC ("Plaintiff" or "SHA") by and through its attorneys, hereby alleges as follows:

### THE PARTIES

1.

Plaintiff is a limited liability company registered in the State of Oregon.

2.

Defendant City of St. Helens ("Defendant" or the "City") is an incorporated municipality in Oregon.

## JURISDICTION AND VENUE

### 3.

Pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b), this Court has exclusive original jurisdiction over this controversy because it arises under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA").  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's non-CERCLA claims because they are so related to the CERCLA claim that they form part of the same case or controversy under Article III of the U.S. Constitution.

### 4.

Pursuant to 28 U.S.C. § 9613(b), venue is proper in this Court because the release of hazardous substances occurred in this District.

## FACTUAL BACKGROUND

### 5.

At all material times, Plaintiff owned portions of the real property known as "Elk Ridge Estates," which is a planned 72-acre residential subdivision located north of the intersection of Hankey Road and Barrick Lane in the City of St. Helens, Columbia County, Oregon 97051 (the "property").

### 6.

The southeastern corner of the property contains a former municipal waste dump or landfill ("dump" or "landfill"), which Plaintiff has remediated under the oversight of the Oregon Department of Environmental Quality ("DEQ").  The landfill was measured to be approximately 600 feet long and between 60 and 140 feet wide, covering approximately 46,000 square feet of

surface area, to extend below the surface up to 19.5 feet, and to occupy approximately 28,000 cubic yards of earth.

7.

Another part of the property contains a solid waste disposal cell ("disposal cell") that Plaintiff has remediated under DEQ oversight.   The disposal cell was measured to be approximately 245 feet long and between 70 and 100 feet wide, covering approximately 12,500 feet of surface area, to extend below the surface up to 10 feet, and to occupy approximately 4,600 cubic feet of earth.

8.

The landfill and disposal cell have been the subject of hazardous substance removal and remedial actions performed by Plaintiff and administered and overseen by DEQ.

**SITE HISTORY**

9.

In 1939, the City enacted Ordinance 617 that "regulat[ed] the collection and disposal of garbage in the City of St. Helens, Oregon, and provid[ed] penalty for violation thereof."   The ordinance provided, "[a]ny person hauling or collecting garbage, under the provisions of this ordinance, shall provide a suitable place for the dumping and disposal of such garbage at least 1000 feet outside of the city limits of said City of St. Helens."   The ordinance further provided that the hauling of garbage would "be under the supervision of the City Health Committee."   Violations of the ordinance were punishable "by a fine of not more than $25.00 or by imprisonment in the city Jail of not more than 10 days, or by both such fine and imprisonment."

10.

From around 1940 to 1970 the dump served as the City's municipal solid waste dump and regularly accepted all manner of waste generated by the City, its businesses, and its residents. The City granted a garbage company the exclusive right to pick up garbage within the City with the knowledge and intent that it would take that garbage to the dump at the property. The City's use of the dump was common knowledge throughout the community. There was no other dump site near the City that accepted municipal garbage until around 1970, when the dump stopped operating and the City began sending its garbage to another location.

11.

On April 5, 1979, the City approved Boundary Change Proposal No. 1393 and annexed the property. Until then the dump was less than 1,000 feet outside the City limits. The City's arrangements for garbage disposal at the dump from approximately 1940 to 1970 violated Ordinance 617.

12.

In or around November 1995, the City received a Level 2 environmental impact study ("EIS"). The EIS described the recent removal of approximately 12,500 pounds of scrap metal from the dump. The EIS reported detections of hazardous substances in water samples taken from the dump, specifically arsenic, barium, cadmium, chromium, lead, mercury, and silver. The EIS stated: "Proper engineering, which may include compaction, will make the landfill area suitable for development."

13.

In July 1996, the City asked City engineers Dave Novak and Esco Bell to review the EIS and advise as to whether its conclusions were correct and whether the area was "safe for humans

to inhabit or play on or around."  Novak consulted with DEQ solid waste engineer Ernie Schmidt and DEQ hydrologist Bruce Desselier.  Novak then responded to the City with a memorandum that advised, based on Schmidt and Desselier's recommendations: (a) barium, chromium, and mercury levels were at or above the applicable regulatory standards; (b) the area should be tested for methane gas; (c) there should be no construction on the dump; and (d) water wells should not be allowed on or downstream of the dump.

14.

In August 1996, the property was owned by St. Helens Heights, Oregon Limited Partnership ("St. Helens Heights").  St. Helens Heights sought the City's  approval of a final plat for a 267-lot residential subdivision.  The City communicated to St. Helens Heights that the area of the dump had to be shown on the final plat, the area was not to be developed, and there could be no water wells in or downstream of the dump because of high levels of heavy metal pollutants.  In August 1999, the City approved a modification to the preliminary plat that was expressly subject to the City's prior conditions of approval related to the dump.

15.

The City knew since at least August 1996 that the dump contained actionable levels of hazardous substances that had been released into the environment.  At no time during the City's land use approval process, nor at any other time, did the City ever perform or require a remedial action at the dump.

16.

In 2007, Elk Meadow Development LLC ("Elk Meadow") owned the property.  Elk Meadow had its excavation contractor remove about 4,600 cubic yards of soil and debris from the dump and dispose of it in another area of the property, creating the disposal cell.

17.

On March 23, 2007, the City received a geotechnical engineering study that described the presence of "nine feet of soft uncontrolled fill with garbage" at the property.  Around August 2007, the City received three letters reminding it of the dump and informing it of Elk Meadow's removal of garbage from the dump.  The City took no action in response to the geotechnical report and letters.

18.

In or around July 2007, a lab hired to analyze samples collected by Elk Meadow's contractor sent a copy of its lab report to DEQ.  On August 6, 2007, DEQ added the property to its Environmental Cleanup Site Information ("ECSI") database of known hazardous substance release sites requiring further action as ECSI Site ID no. 4857.  DEQ recommended site screening, i.e., investigation of the hazardous substances at the site.  After DEQ designated the property a cleanup site, Elk Meadow abandoned its development plans and gave a *Non-Merger Deed in Lieu of Foreclosure* to Sterling Savings Bank ("Sterling"), which was recorded in the Columbia County real estate records for the property on June 13, 2011.

19.

On February 13, 2012, Plaintiff purchased the property from Sterling.  Before closing, Plaintiff called the City building department and inquired about the property, which already had been developed with streets and a number of home lots.  The City said nothing about the dump, disposal cell, release of hazardous substances, or DEQ cleanup site.  After closing, Plaintiff learned the property was the location of a DEQ cleanup site and contacted DEQ to inquire about it.  DEQ communicated that Plaintiff was required to perform an environmental investigation of the property.

Page 6 -    COMPLAINT

20.

On or about August 4, 2012, Plaintiff signed an Independent Cleanup Pathway Letter Agreement with DEQ, under which Plaintiff agreed to complete: (1) a remedial investigation ("RI") to investigate the nature and extent of hazardous substance contamination at the site; and (2) a feasibility study ("FS") to develop alternatives for a permanent remedial action to protect human health and the environment from the hazardous substances at the site.

21.

Soil and sediment samples from the dump collected in 2012, 2013, 2015, and 2016 showed elevated concentrations of each of the following substances: metals (including arsenic, cadmium, copper, and lead) and polychlorinated biphenyls ("PCBs"). Each of these substances is a "hazardous substance" within the meaning of Or. Rev. Stat. § 465.200(16), 42 U.S.C. § 9601(14), 40 C.F.R. § 116.4, and 40 C.F.R. § 401.15. The presence of these hazardous substances in soils and sediments at the property constitutes a "release" to the environment within the meaning of Or. Rev. Stat. § 465.200(22) and 42 U.S.C. § 9601(22).

22.

In August 2016, Plaintiff submitted information equivalent to a Final RI to DEQ. In September 2019, Plaintiff submitted to DEQ a report equivalent to a Final FS, entitled, *Analysis of Cleanup Alternatives* ("ACA").

23.

In June 2020, DEQ selected a remedial action for the site and documented that decision in a *Record of Decision* ("ROD").

24.

The selected remedial action required SHA to do each of the following:

(a)  cap the dump and disposal cell with three feet of clean soils;

(b)  cap or remove a surface water impoundment;

(c)  construct a stormwater management system to divert stormwater from the property away from the dump;

(d)  prepare a Contaminated Media Management Plan ("CMMP"), Soil Cap Management Plan ("SCMP"), and Stormwater Management Plan ("SMP"); and

(e)  record an Easement and Equitable Servitudes ("EES") in the public real estate records for the property to make current and future landowners responsible for inspections and maintenance of the soil caps at the dump and disposal cell.

25.

In the summer of 2022 Plaintiff began constructing the permanent remedy for the site.

26.

On October 21, 2022, within 180 days after beginning to construct the permanent remedy for the site, Plaintiff issued a tort claim notice to Defendant pursuant to Or. Rev. Stat. § 30.275. It notified Defendant of Plaintiff's intent to allege claims for recovery of money and/or damages against Defendant, including claims for cost recovery or contribution.  It notified Defendant of Plaintiff's intent to recover remedial action costs pursuant to Or. Rev. Stat. Chapter 465 and/or response costs pursuant to CERCLA, as well as declaratory judgment regarding liability for future remedial action costs and response costs associated with the site.

27.

To date, Plaintiff has incurred approximately $1,500,000 in past remedial action costs and response costs associated with the site.  These costs include consulting fees, contractor fees,

and DEQ oversight costs.  The exact value of Plaintiff's remedial action costs and response costs remains to be determined.

28.

On March 1, 2024, Plaintiff recorded in the real estate records of Columbia County two EESs—one for the landfill and one for the disposal cell—that imposed certain land use requirements and restrictions required by DEQ, such as the requirement to comply with the SCMP and the restriction not to occupy the landfill or disposal cell.

29.

On March 7, 2024, DEQ issued a *Conditional No Further Action Determination* ("NFA") for the site.  The NFA states, "DEQ has determined that remedial action to address environmental contamination at the Site is complete, and no further action is required, conditioned upon adherence to the restrictions in the two [EESs] recorded in the respective title records for the Landfill and Disposal Cell."

30.

On April 2, 2024, Plaintiff recorded statutory bargain and sale deeds in the Columbia County real estate records that conveyed fee title ownership of the landfill and disposal cell to the Elk Ridge Home Owners Association ("HOA").

**FIRST CLAIM FOR RELIEF**

**(Cost Recovery – 42 U.S.C. § 9607(a))**

31.

Plaintiff realleges and incorporates the foregoing allegations in paragraphs 1 through 30 into this claim as if fully set forth herein.

32.

The landfill and disposal cell constitute a "facility" under CERCLA's definition of that term, as stated in 42 U.S.C. § 9601(9), because they are each or together a pit, ditch, landfill, site, and/or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

33.

Plaintiff is a "person" who has incurred "necessary costs of response" that were "consistent with the national contingency plan" within the meaning of 42 U.S.C. §§ 9607(a)(4)(B) and 9601(21), (25), and (31).  The total value of these "response costs" has yet to be determined and is estimated at around $1,500,000.

34.

Pursuant to 42 U.S.C. §§ 9607(a)(2), (3), and/or (4), Defendant is liable for Plaintiff's response costs.

35.

Defendant is liable for Plaintiff's response costs under 42 U.S.C. § 9607(a)(2) because Defendant is a "person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" within the meaning of 42 U.S.C. § 9607(a)(2).

36.

Defendant is liable for Plaintiff's response costs under 42 U.S.C. § 9607(a)(3) because Defendant is a "person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any

facility . . . owned or operated by another party or entity and containing such hazardous substances" within the meaning of 42 U.S.C. § 9607(a)(3).

37.

Defendant is liable for Plaintiff's response costs under 42 U.S.C. § 9607(a)(4) because Defendant is a "person who . . . accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" within the meaning of 42 U.S.C. § 9607(a)(4).

38.

Pursuant to 42 U.S.C. § 9607(a) and controlling federal case law, including but not limited to *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007), and *Kotrous v. Goss-Jewett Co. of Northern Cal.*, 523 F.3d 924 (9th Cir. 2008), Plaintiff is entitled to cost recovery and a money award from Defendant for Plaintiff's response costs in an amount to be determined at trial of up to $1,500,000.

39.

Plaintiff is entitled to an award of prejudgment interest pursuant to 42 U.S.C. § 9607(a).

40.

This claim shall be limited to the extent necessary to comply with Or. Rev. Stat. § 30.275, such as by limiting the response costs that are subject to cost recovery under this claim to those paid within the 180 days prior to Plaintiff's tort claim notice to Defendant and thereafter.

## SECOND CLAIM FOR RELIEF

### (Contribution – Or. Rev. Stat. §§ 465.325(6)(a) and 465.257)

41.

Plaintiff realleges and incorporates the foregoing allegations in paragraphs 1 through 30 into this claim as if fully set forth herein.

42.

The landfill and disposal cell constitute a "facility" under the definition of that term stated in Or. Rev. Stat. § 465.200(13) because they are each or together a pit, ditch, landfill, site, and/or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

43.

Plaintiff is a "person" who has incurred "remedial action costs . . . that are attributable to or associated with a facility" within the meaning of Or. Rev. Stat. § 465.255(1) and Or. Rev. Stat. § 465.200(6), (13), and (16).

44.

Defendant is a "person who is liable or potentially liable under ORS 465.255" ("PLP") within the meaning of Or. Rev. Stat. §§ 465.325(6)(a) and 465.257(1).

45.

Defendant is a PLP because Defendant is an "owner or operator at or during the time of the acts or omissions that resulted in the release" within the meaning of Or. Rev. Stat. §§ 465.255(1)(a) and 465.200(12) and (14).

46.

Defendant is a PLP because Defendant is a "person who, by any acts or omissions, caused, contributed to or exacerbated the release" within the meaning of Or. Rev. Stat. §§ 465.255(1)(d) and 465.200(13) and (14).

47.

Pursuant to Or. Rev. Stat. §§ 465.325(6)(a) and/or 465.257, Plaintiff is entitled to an equitable apportionment of up to 100% of Plaintiff's remedial action costs to Defendant and a money award in an amount to be determined at trial of up to $1,500,000. Plaintiff has paid more than its equitable share of the remedial costs attributable to or associated with the facility.

48.

It is equitable to apportion up to 100% of Plaintiff's remedial action costs to Defendant based on the allegations set forth above, including but not limited to the following factors:

(a) Plaintiff did not dump or otherwise contribute any of the hazardous substances at the site;

(b) the hazardous substances at the site came from municipal garbage Defendant generated and knowingly arranged to be transported to and dumped at the site over the course of approximately 30 years in violation of its own Ordinance 617; and

(c) Defendant has done nothing to remediate the site or require others to remediate the site, whereas Plaintiff responsibly investigated and remediated the site under DEQ oversight.

49.

All or some of Plaintiff's remedial action costs are readily ascertainable. Pursuant to Or. Rev. Stat. § 82.010, Plaintiff is entitled to an award of prejudgment interest on all readily ascertainable sums owed by Defendant.

50.

This claim shall be limited to the extent necessary to comply with Or. Rev. Stat. § 30.275, such as by limiting the remedial action costs that are subject to equitable apportionment under this claim to those paid within the 180 days prior to Plaintiff's tort claim notice to Defendant and thereafter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. On Plaintiff's First Claim for Relief (Cost Recovery – 42 U.S.C. § 9607(a)), a judgment against Defendant awarding:

   (a) cost recovery pursuant to 42 U.S.C. § 9607(a);

   (b) a money award in an amount to be determined at trial of up to $1,500,000.

   (c) prejudgment interest pursuant to 42 U.S.C. § 9607(a);

   (d) an award of costs pursuant to Fed. R. Civ. P. 54; and

   (e) any other relief the Court deems just and equitable.

2. On Plaintiff's Second Claim for Relief (Contribution – Or. Rev. Stat. §§ 465.325(6)(a) and 465.257), a judgment against Defendant awarding:

   (a) equitable apportionment of up to 100% of Plaintiff's remedial action costs pursuant to Or. Rev. Stat. §§ 465.325(6)(a) and 465.257;

   (b) a money award in an amount to be determined at trial of up to $1,500,000;

(c)  prejudgment interest pursuant to Or. Rev. Stat. § 82.010.

(d)  an award of costs pursuant to Fed. R. Civ. P. 54; and

(e)  any other relief the Court deems just and equitable.

April 17, 2024

CHENOWETH LAW GROUP, PC

*/s/ Brooks M. Foster*
Brooks M. Foster, OSB No. 042873
Bradley T. Crittenden, OSB No. 173274
Chenoweth Law Group, PC
510 SW Fifth Avenue, Fourth Floor
Portland, OR 97204
Telephone:  (503) 221-7958
Email: bfoster@chenowethlaw.com
        bcrittenden@chenowethlaw.com

*Of Attorneys for Plaintiff*